IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| GARRETT S. INKYO,<br><br>        Plaintiff,<br><br>    vs.<br><br>OAHU TRANSIT SERVICES, INC.,<br><br>        Defendant. | Case No. 22-cv-00436-DKW-KJM<br><br>**ORDER GRANTING DEFENDANT OAHU TRANSIT SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT** |

## INTRODUCTION

Plaintiff Garrett Inkyo was a driver employed and then terminated by

Defendant Oahu Transit Services, Inc. (OTS), the company that runs the public bus

service (known locally as "The Bus") on O'ahu.   Following a series of unfortunate

events that could leave one to wonder what it takes for a bus driver to be told to

stop driving buses, Inkyo was, instead, allowed to continue.   He was given, and

eventually signed, a Last Chance Agreement (LCA), which provided that he would

be subject to "automatic dismissal" for a period of three years if he was involved in

a "preventable accident" causing "major" property damage.   Thereafter, it did not

take Inkyo long to be involved in many more unfortunate events, none of which

triggered the "automatic dismissal" provision.   However, roughly a year after

entering the LCA, Inkyo's luck ran out when a bus he was driving collided with a

utility pole.   The bus did so because Inkyo was admittedly "asleep" at the wheel.

Perhaps due to the damage caused to the bus, this accident was sent to a three-

person Major Accident Committee (MAC) to determine whether it was

"preventable", pursuant to a Collective Bargaining Agreement and the LCA.   The

MAC unanimously found that the utility pole crash was preventable.   As a result,

Inkyo was terminated in accordance with the automatic dismissal provision of the

LCA.

Unsatisfied with that seemingly common-sense result, Inkyo brings this

lawsuit, alleging disability discrimination and a failure to accommodate under the

Americans With Disabilities Act (ADA).   According to Inkyo, after the utility

pole crash, he was diagnosed for the first time with sleep apnea.   And that is about

the essence of his lawsuit: he was fired after being diagnosed with sleep apnea.

Inkyo fails, however, to provide evidence in support of much, if not all, of his

claims.   Inkyo, for instance, presents no evidence that he was, in fact, "disabled"

for purposes of the ADA.   He also entirely ignores the glaring facts in this case:

after a lengthy and troubling history of accidents and indiscretions while driving a

public bus, Inkyo was eventually fired for crashing a bus into a pole while

sleeping, pursuant to the clear and express terms of the LCA.   Therefore, for the

reasons more fully set forth below, the motion for summary judgment, Dkt. No. 55, is GRANTED, with JUDGMENT to enter forthwith in favor of OTS.

## RELEVANT PROCEDURAL BACKGROUND

On October 4, 2022, Inkyo initiated this proceeding with the filing of a single-count Complaint, alleging disability discrimination under the Americans With Disabilities Act of 1990.   Dkt. No. 1.   Despite the single-count, Inkyo appears to allege that he had been discriminated against in two respects: (1) with regard to his termination; and (2) with regard to OTS' alleged failure to provide an unidentified reasonable accommodation.

On August 5, 2024, OTS filed the instant motion for summary judgment, along with, on October 1, 2024, an amended concise statement of material facts. Dkt. Nos. 55, 60.   On October 11, 2024, Inkyo filed an opposition to the motion for summary judgment and his own concise statement of facts.   Dkt. Nos. 61-62. On October 18, 2024, OTS filed a reply in support of its motion for summary judgment and a concise statement of facts in reply to Inkyo's opposition.   Dkt. Nos. 63-64.   This Order now follows.

3

# FACTUAL BACKGROUND[1]

OTS hired Inkyo as a bus operator in 1997.   DCSF at ¶ 1, Dkt. No. 60;

PCSF at ¶ 1, Dkt. No. 61.   Inkyo's position was subject to OTS' employment,

safety, and driving policies and procedures.   DCSF at ¶ 2; PCSF at ¶ 2.   Inkyo

understood that OTS' "safety first policy" meant that "if it cannot be done safely,

don't do it", and defensive driving was a condition of his employment.   DCSF at ¶

3; PCSF at ¶ 3.   Inkyo further understood that he was held to a "higher standard"

than "normal everyday" drivers, and he had to do everything he could to prevent

being involved in an accident.   DCSF at ¶ 4; PCSF at ¶ 4.

Inkyo's employment was subject to a Collective Bargaining Agreement

(CBA) between OTS and the Hawaii Teamsters and Allied Workers Local 996

(Union).   DCSF at ¶ 6; PSCF at ¶ 6.   Pursuant to the CBA, when an employee is

involved in a "major accident", a committee, to which the Union designates a

representative, votes to decide whether the accident was "preventable."   DCSF at

¶ 7; PCSF at ¶ 7; CBA at ¶ 41.6, Dkt. No. 60-4.   "Major accidents" include those

in which "one or more vehicles incur disabling damage."   PCSF at ¶ 8 (brackets

omitted); PCSF at ¶ 8.   "Preventable" accidents are those where "the bus operator

---

[1]The facts are taken from OTS' concise statement of facts (DCSF), Inkyo's concise statement of facts (PCSF), OTS' concise statement of facts in reply (RCSF), and the exhibits filed in support of each.

failed to do everything that reasonably could have been done to avoid the accident."   DCSF at ¶ 9; PCSF at ¶ 9.

During his employment with OTS, Inkyo received disciplinary actions on account of poor performance and behavior for years.   DCSF at ¶ 10.[2]   In October 2016, after failing to notice a bicyclist until it was in front of his bus, Inkyo knocked the bicyclist off the bicycle, resulting in Inkyo being suspended for being involved in a major preventable accident.   DCSF at ¶ 12.[3]   Inkyo was also "re-trained" on preventable accidents, including on everything that could be reasonably expected to avoid an accident.   DCSF at ¶ 13; PCSF at ¶ 13.   In August 2017, notwithstanding his re-training, and after switching his bus to "out of service", Inkyo "cut over" another car, with the driver of the car making a complaint. DCSF at ¶ 14.   On or around January 23, 2018, a bus rider complained about

[2]In the PCSF, Inkyo "partially dispute[s]" this statement.   PCSF at ¶ 10.   Inkyo's partial dispute is not premised upon the accuracy of the statement, but, rather, on his contention that the "years" of his poor performance and behavior should be limited to those events falling within "three years" of his termination.   *See id*.   While, pursuant to the CBA, and as between the Union and OTS this may be true in certain situations, *see* CBA at ¶ 14.1, for purposes of the factual background of this case, Inkyo's on-the-job performance and behavior is relevant, at the very least, to establish a *background* regarding the same.   In that regard, it is not just Inkyo's termination that is important here.   Notably, performance and behavior that led to the LCA is relevant, and, herein, all events set forth took place within three years of the LCA.
[3]Inkyo partially disputes this statement.   PCSF at ¶ 12.   However, like other events, his dispute is premised solely upon the timing, rather than the occurrence, of the event.   *See id*.; *see also id*. at ¶¶ 14-15.   At the very least, because these events occurred within three years of the LCA they are relevant here.

Inkyo, after which Inkyo admitted that his tone when speaking with the rider got "out of hand" and "a little loud."   DCSF at ¶ 15.

In or around July 2018, a passenger slid off her seat after Inkyo hit the brakes on his bus.   DCSF at ¶ 16.[4]   As the passenger exited the bus, she criticized Inkyo's driving, to which Inkyo responded that he paid more in taxes than the passenger.   Depo. of Garrett Inkyo at 100:14-22, Dkt. No. 60-2.   Also in or around July 2018, not wanting to fall behind on his schedule due to traffic in the right-hand lane, Inkyo stopped the bus in the left-hand lane.   *Id.* at 103:5-9, 104:8-14, 105:13-21.   This resulted in Inkyo being suspended.   DCSF at ¶ 17.   And again in or around July 2018, "several minutes down" on his schedule, Inkyo did not allow a member of the public to board his bus after closing the front doors. Inkyo Depo. at 110:12-14, 110:24-111:1, 111:20-23.   This too resulted in Inkyo being suspended.   DCSF at    ¶ 18.   Still in or around July 2018, a right mirror of Inkyo's bus hit a pole.   DCSF at ¶ 19.   On October 28, 2018, Inkyo failed to

---

[4]Inkyo partially disputes this statement.   PCSF at ¶ 16.   Again, like many other statements, he does not dispute the occurrence of the event.   *See id.*; *see also id.* at ¶¶ 17-19, 21, 28.   Instead, he states only that he "responds to this incident in Ex. B…."   *See id.*   However, providing an arguably alternative narrative for an incident, which is presumably the purpose of Exhibit B, does little to comply with Local Rule 56.1(e)'s requirement that a party partially disputing a factual assertion state "specifically what is admitted and what is denied."   Rather, it places the burden on the Court to divine the same.   Herein, the Court sets forth the version of events supported by the evidence submitted, while taking note of Inkyo's failure to comply with the pertinent Local Rule.

properly conduct a "pre-trip test", resulting in a written warning.  *Id*. at ¶ 20;
PCSF at ¶ 20.

On March 1, 2019, Inkyo "blew the [bus] horn" at an individual turning into
an intersection, which Inkyo self-described as him having a "road rage incident…."
Inkyo Depo. at 119:8-11.  The individual in the car then followed Inkyo's bus,
eventually caught up with Inkyo, got out of his car, and swore at Inkyo.  *Id*. at
119:12-16.  Inkyo then "lost it[,]" using foul language, such as "You shouldn't
drive like an effing asshole[.]"  *Id*. at 119:17, 120:2-3, 9-13.  Inkyo also stopped
his bus at a red light and ran out of the bus to get the driver's license plate number.
*Id*. at 120:6, 121:1-3.  For this incident, Inkyo was "suspended pending
termination."  DCSF at ¶ 21.

In April 2019, as a condition to his return to work, Inkyo was required to
enter into the LCA, which he initially refused to do.  DCSF at ¶ 22; PCSF at ¶ 22.
As a result, Inkyo was "suspended, pending termination[.]"  DCSF at ¶ 23; PCSF
at ¶ 23.  On June 21, 2019, a meeting was held to determine whether Inkyo could
return.  *Id*.  During the meeting, which Inkyo attended, he stated that an "anger
problem" and "financial pressures" were affecting his ability to perform his job.
DCSF at ¶ 24; PCSF at ¶ 24; Inkyo Depo. at 128:6-8.  Inkyo further stated that he
had a "totally different outlook on the requirements of his job" and would follow

OTS' employment policies.   DCSF at ¶ 25; PCSF at ¶ 25.   On or around July 16, 2019, Inkyo signed the LCA and returned to work.   DCSF at ¶ 26; PCSF at ¶ 26; Inkyo Depo. at 148:1-8.   Pursuant to the LCA, Inkyo could be automatically dismissed if, within three years, he was involved in a "class 3 violation", which included "preventable accidents causing major property damage…."   DCSF at ¶ 27; PCSF at ¶ 27.

After signing the LCA and returning to work, Inkyo was involved, or reported to have been involved, in a number of incidents.   DCSF at ¶ 28.[5]   First, it was reported that Inkyo failed to yield to an ambulance, although Inkyo maintained that the ambulance was "at a considerable distance…."   DCSF at ¶ 28; Inkyo Depo. at 153:7-154:23.   Second, Inkyo collided with a tree branch that he stated he did not see, causing damage to the windshield of the bus.   DCSF at ¶ 28; PCSF at ¶ 28.   Third, Inkyo collided with the outside mirror of another moving vehicle. *Id*.   Fourth, Inkyo failed to stop for a man waving his arms at a bus stop because, according to Inkyo, he did not see the man.   *Id*.   Inkyo received counseling for these incidents.   *Id*.   He also again received additional training, including being shown a video on driver fatigue.   DCSF at ¶ 29; PCSF at ¶ 29.

---

[5]For the post-LCA incidents, neither party provides a date for any of the same.   *See* DCSF at ¶ 28; PCSF at ¶ 28.   Therefore, the Court lists them herein in the order set forth in the parties' concise statements of fact, which may or may not be in the order of their occurrence.

On July 2, 2020, Inkyo collided with a utility pole while driving a bus containing passengers.   DCSF at ¶30; PCSF at ¶ 30.   Prior to the collision, and while waiting at a traffic light, Inkyo had been resting his head on his hand/arm. DCSF at ¶ 31.[6]   After the light changed, Inkyo continued driving, fell asleep at the wheel, and lost control of the bus, causing it to jump the curb and collide into the utility pole.   DCSF at ¶ 32; PCSF at ¶ 32.   According to Inkyo, just prior to the collision, he "suddenly" fell asleep while driving.   PCSF at ¶ 43; RCSF at ¶ 43. At his deposition, Inkyo stated that, prior to the collision, he felt that he could operate the bus safely, and he did not communicate any concern with the same to OTS' control center because he "did not feel that [he] was fatigued enough where [he] should be taken off the road."   DCSF at ¶ 33;[7]  Inkyo Depo. at 190:4-16. This accident caused approximately $53,000 of damage to the bus, including two windshields, the main bus door, the door frame, and the front bumper, rendering it inoperable.   DCSF at ¶ 35; PCSF at ¶ 35.

---

[6]Inkyo partially disputes this statement.   PCSF at ¶ 32.   However, again, he fails to state that to which he denies and that to which he admits.   *See id*.   Further, Inkyo's apparent disagreement—that he was not holding his head "because he was fatigued"—is not even part of OTS' concise statement.   *See id*.; DCSF at ¶ 32.   Therefore, the Court does not find there to be a dispute, partial or otherwise, in this regard.

[7]Inkyo partially disputes this statement.   PCSF at ¶ 33. However, yet again, he fails to state that to which he denies and that to which he admits.   *See id*.   To repeat, it is not the Court's responsibility to divine Inkyo's disagreement – that responsibility lies with Inkyo by rule.   The Court sets forth the facts supported by the evidence submitted, while taking note of Inkyo's failure to comply with the pertinent Local Rule.

Prior to the accident, Inkyo had not been aware, and did not discuss with

OTS, that he had an underlying medical condition.   DCSF at ¶ 34.[8]   After the

accident, however, Dr. Michael Kusaka examined Inkyo on or around July 14,

2020 to assess his fitness for duty and referred Inkyo to a specialist for a sleep

apnea evaluation.   That evaluation was performed on August 4, 2020.   DCSF at ¶

36; PCSF at ¶¶ 36, 46; RCSF at ¶¶ 46-47.[9]   The specialist diagnosed Inkyo with

"moderate" sleep apnea.[10]   PCSF at ¶ 48; RCSF at ¶ 48; Home Sleep Apnea Study

Report at 3, Dkt. No. 61-5.[11]   The sleep apnea report stated that Inkyo's oxygen

level was 82% for 2 seconds and his average oxygen level was 91%.   Home Sleep

Apnea Study Report at 4.   According to Inkyo, Dr. Kusaka told him that his

oxygen level should be between 95-100%, and he needed to use a "CPAP

---

[8]Inkyo partially disputes this statement.   PCSF at ¶ 34.   However, once again, he fails to state
that to which he denies and that to which he admits.   *See id.*   Further, review of Inkyo's
purported disagreement reflects no such dispute as, on their face, the two cited statements appear
to say the same thing: Inkyo was not aware of any medical condition prior to the July 2, 2020
accident.   *See id.*; DCSF at ¶ 34.   Therefore, the Court does not find there to be a dispute,
partial or otherwise, in this regard.
[9]Inkyo states that the evaluation was performed on August 8, 2020.   PCSF at ¶ 47.   However,
the actual evaluation "report" states that the "Study Date" was August 4, 2020, *see* Dkt. No. 61-5
at 3, which is, therefore, the date used herein.
[10]The Court notes that neither party provides a specific date for when Inkyo was diagnosed with
sleep apnea or, even, the name of the specialist who made that diagnosis.   *See* DCSF at ¶37;
PCSF at ¶¶ 37, 47-48; RCSF at ¶ 47-48.   The Court further notes, however, that OTS does not
specifically dispute Inkyo's assertion in the PCSF that he has been diagnosed with the condition.
*See* PCSF at ¶ 48; RCSF at ¶ 48.
[11]There are no page numbers for the Home Sleep Apnea Study Report.   Therefore, the Court
uses the page numbers assigned in the top right-hand corner of the document, *i.e.*, "Page 4 of 6."

machine" every night because, if untreated, sleep apnea could cause him "excessive drowsiness that was dangerous for driving the bus." Decl. of Garrett Inkyo at ¶¶ 8-9, Dkt. No. 61-1. Inkyo denied, however, having any symptoms of sleep apnea, having poor sleep, or that the condition affected his daily life or ability to drive. DCSF at ¶ 38; PCSF at ¶ 38. According to Inkyo, prior to the July 2, 2020 bus accident, he had never fallen asleep while driving. PCSF at ¶ 45; RCSF at ¶ 45.

From July 14, 2020 to September 21, 2020, Inkyo was required to take a "leave of absence" to undergo treatment for sleep apnea using a CPAP machine. PCSF at ¶¶ 49-50; RCSF at ¶¶ 49-50. This absence was approved by Ralph Faufata. PCSF at ¶ 51; RCSF at ¶ 51.[12] On or around September 21, 2020, Inkyo was released to and resumed work with no restrictions. DCSF at ¶ 39; PCSF at ¶ 39. He did not discuss his sleep apnea with anyone at OTS. *Id*.[13] Inkyo also did not request or require modifications to his work duties or conditions. DCSF at

---

[12]Neither the PCSF nor the DCSF identifies Faufata beyond his name. Based upon the Court's independent review of the evidence, however, it appears that, at the relevant time, Faufata was OTS' Vice President of Transportation. *See* Decl. of Robril Tingcang at ¶ 13, Dkt. No. 60-32.
[13]Inkyo appears to dispute this statement. *See* PCSF at ¶ 39. However, once again, he fails to state that to which he specifically denies and that to which he admits. *See id*. Further, Inkyo's apparent clarification of OTS' statement does not, in fact, dispute the assertion that *Inkyo* did not *discuss* his sleep apnea with anyone at OTS. *See id*. Therefore, the Court does not find there to be any dispute in this regard.

¶ 40; PCSF at ¶ 40.   Inkyo continued to use, though, a CPAP machine every night due to sleep apnea.   PCSF at ¶ 53; RCSF at ¶ 53.

Between March 4, 2021 and March 9, 2021, three members of the Major Accident Committee (MAC)—Robril Tingcang, Rudolph Thompson, and Vera Vierra— reviewed the July 2, 2020 accident to determine whether it was "preventable[.]"   PCSF at ¶¶ 55-57; RCSF at ¶¶ 55-57; Decl. of Robril Tingcang at ¶¶ 3, 9-10, Dkt. No. 60-32; Decl. of Rudolph Thompson at ¶¶ 4, 8-10, Dkt. No. 60-33; Decl. of Vera Vierra at ¶¶ 2, 6-8, Dkt. No. 60-34.   The MAC members unanimously and independently of each other determined that the July 2, 2020 accident was "preventable[.]"   DCSF at ¶ 41; Tingcang Decl. at ¶¶ 11-12; Thompson Decl. at ¶¶ 11, 14; Vierra Decl. at ¶¶ 9-10.[14]   At least two of the three MAC members did not know of Inkyo's sleep apnea condition.   Thompson Decl. at ¶ 15; Vierra Decl. at ¶ 11.[15]   Faufata, though, knew about Inkyo's sleep apnea

---

[14]On yet another occasion, Inkyo disputes a statement without identifying that to which he denies and that to which he admits.   *See* PCSF at ¶ 41.   However construed, though, Inkyo's dispute does not concern the *result* of the MAC's decision: a 3-0 finding that the accident was "preventable."

[15]Based upon the PCSF, the MAC members' knowledge of Inkyo's condition is disputed.   PCSF at ¶ 41.   The dispute, however, is not legitimate with at least two of the three members.   First, Inkyo does not even attempt to suggest that Thompson, the Union-assigned representative to the MAC, *see* Thompson Decl. at ¶ 4, was aware of his sleep apnea.   *See* PCSF at ¶ 41.   Second, while Inkyo contends that Vierra "should have" known about his condition, he never asserts that she *did* know, let alone cite any evidence to support any such finding.   Therefore, at the very least, the evidence reflects that a *majority* of the MAC members were unaware of Inkyo's condition and made their decisions independently.   As for Tingcang, the evidence is arguably

diagnosis.   PCSF at ¶¶ 62-63.[16]   On March 12, 2021, OTS terminated Inkyo's

employment because the MAC's determination—that the July 2, 2020 collision

was a "major preventable accident"—triggered the automatic dismissal provision

of the LCA.   DCSF at ¶ 42.[17]

## STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56(a), a party is entitled to

summary judgment "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."   In

particular, the movant's "initial responsibility" is to inform the district court of the

---

inconclusive.   While one paragraph of Inkyo's wide-ranging declaration suggests that Tingcang
might have been aware of some unspecified treatment for sleep apnea, *see* Inkyo Decl. at ¶ 16,
other paragraphs are less clear (Inkyo being approved for sick leave or benefits generally), *see id*.
at ¶¶ 18, 24.   Either way, there is no evidence that Tingcang knew Inkyo had been diagnosed
with sleep apnea at any point after the August 4, 2020 sleep apnea report and up to March 9,
2021 when the MAC's decision was made.   *See id*. at ¶¶ 16, 18 24 (stating that Inkyo and
Tingcang spoke in *July 2020* about Inkyo's need to have "treatment" for sleep apnea – before
Inkyo was ever diagnosed with the condition).   In any event, viewing the evidence in the light
most favorable to Inkyo, there is a level of dispute as to what Tingcang knew and when.   As will
be seen, however, there is no evidence that Tingcang made his "preventable" decision due to any
possible knowledge of Inkyo's condition.
[16]OTS purports to dispute this statement.   RCSF at ¶¶ 62-63.   However, its dispute concerns
only the MAC members, as opposed to Faufata.   *See id*.   Therefore, the Court does not find any
dispute in that regard.
[17]For a final time, Inkyo disputes this statement without identifying that to which he denies and
that to which he admits.   *See* PCSF at ¶ 42.   Although it is not perfectly clear, it appears that
Inkyo disputes *why* he was terminated.   *See id*.   Inkyo's opposing statement and the evidence to
which he cites, however, at best, merely asserts why *he* thinks he was terminated.   *See id*.   It
does not challenge the facts that (1) the MCA unanimously found the July 2, 2020 collision was
a "major preventable accident", and (2) such an accident triggered an automatic dismissal
provision in the LCA.   Therefore, the Court does not find any dispute in this regard.

basis for its motion and to identify those parts of the record "which it believes
demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.
Catrett*, 477 U.S. 317, 323 (1986). The moving party is then entitled to judgment
as a matter of law if the non-moving party fails to make a sufficient showing on an
essential element of a claim in the case on which the non-moving party has the
burden of proof. *Id.* In assessing a motion for summary judgment, all facts are
construed in the light most favorable to the non-moving party. *Genzler v.
Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005).

## DISCUSSION

In the Complaint, Inkyo arguably alleges claims for disability discrimination
due to (1) the termination of his employment and (2) OTS' failure to reasonably
accommodate his sleep apnea. With respect to the latter, however, to the extent a
reasonable accommodation claim is alleged in the Complaint, it has now,
essentially, been abandoned. Notably, Inkyo presents no evidence that he has ever
requested, let alone been denied, any accommodation for his sleep apnea,
reasonable or otherwise.[18] *See Treviller v. Goldstein*, 2019 WL 1454171, at *5
(N.D. Cal. Apr. 2, 2019) (stating that a prima facie reasonable accommodation

---

[18]Instead, the record reflects that Inkyo did not, in fact, make any request for an accommodation.
*See* DCSF at ¶ 40; PCSF at ¶ 40.

14

claim under the ADA requires, *inter alia*, the plaintiff to request an
accommodation and for the request to be denied); *see also Memmer v. Marin Cty.
Courts*, 169 F.3d 630, 633 (9th Cir. 1999) (holding that it is the plaintiff's
"burden" to establish "the existence of specific reasonable accommodations that
[the employer] failed to provide."); *Snapp v. United Transp. Union*, 889 F.3d 1088,
1095 (9th Cir. 2018) (explaining that "notifying an employer of a need for an
accommodation" is a "trigger[]" for a reasonable-accommodation claim).[19]
Perhaps understandably, therefore, Inkyo fails to even mention a possible
accommodation claim in his opposition.    *See generally* Dkt. No. 62.
Accordingly, the Court spends no further time on any such claim, other than to find
that, to the extent one was initially alleged, OTS is entitled to summary judgment
on the same.

　　　This brings the analysis to the claim Inkyo still pursues at this stage:
disability discrimination under the ADA arising out of his termination.    That claim
is deficient on at least two evidentiary bases.    First, Inkyo has failed to show that

---

[19]An exception to the "request" requirement exists when, *inter alia*, the employer "knows, or has
reason to know, that the disability prevents the employee from requesting a reasonable
accommodation."    *Khorasani v. Mayorkas*, 2024 WL 4227065, at *1 (9th Cir. Sep. 18, 2024)
(citing *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1112 (9th Cir. 2000).    Here, again, Inkyo
provides no evidence, or even an argument, that his alleged disability prevented him from
requesting an accommodation or that OTS should have been aware of the same.

he is "disabled" for purposes of the ADA because there is no evidence that any

aspect of his life has been limited by sleep apnea.    Second, even if Inkyo could

overcome the first deficiency and otherwise establish a *prima facie* claim of

disability discrimination, there is no evidence in the record that OTS' legitimate

reason for firing him—namely, his inability to avoid a utility pole while driving a

public bus, in violation of his LCA—was pretextual.

The Court begins with a *prima facie* claim of discrimination under the ADA.

To establish such a claim, a plaintiff must show that (1) he is disabled within the

meaning of the statute, (2) he is a "qualified individual" under the statute, and (3)

he was discriminated against because of his disability.    *Nunes v. Wal-Mart Stores,*

*Inc.*, 164 F.3d 1243, 1246 (9th Cir. 1999).    Because it is the most obviously

deficient element, the Court starts (and could end) its analysis with whether Inkyo

is disabled for purposes of the ADA.

As Inkyo acknowledges, the ADA defines "disability" as "a physical or

mental impairment that substantially limits one or more major life activities of [an]

individual[,]" a record of such an impairment, or being regarded as having such an

impairment.    42 U.S.C. § 12102(1); *see* Dkt. No. 62 at 13.    The ADA further

states that, *inter alia*, "sleeping", "breathing", and "working" are major life

activities.    *Id*. § 12102(2)(A).    In his opposition, Inkyo contends that each one of

16

these activities was "affected" by his sleep apnea.   Dkt. No. 62 at 13.   Noticeably, however, Inkyo cites not one piece of evidence suggesting that *his* sleep, breathing, or work have been affected, let alone "substantially limited" by sleep apnea.   *See id*.   Instead, the only evidence mentioned is the sleep evaluation performed in August 2020, with Inkyo asserting that his oxygen level was 82%.   *See id*. at 15. As an initial matter, the 82% number Inkyo relies upon is misleading.   While the Home Sleep Apnea Study Report contains that number, it also states that the 82% level lasted for 2 seconds, Inkyo's *average* oxygen level was 91%, and his maximum oxygen level was 97%.   More important, irrespective of Inkyo's oxygen levels during one sleep event,[20]  there is no evidence in the record, such as a medical note from Dr. Kusaka or the "specialist", stating that *Inkyo's* sleep, breathing, or work were substantially limited.[21]   In fact, the record reflects, and Inkyo does not dispute, that they were not.   DCSF at ¶ 38; PCSF at ¶ 38.

Bereft of any evidence supporting his own disability under the ADA, Inkyo relies upon the conditions, symptoms, and activities of the plaintiff in a different

---

[20]The Home Sleep Apnea Study Report further states that Inkyo was monitored for a total of 144.6 minutes from roughly 6:52 a.m. to 9:35 a.m. and the data in the report was "limited…." Dkt. No. 61-5 at 3-4.

[21]Rather, at most, there is Dr. Kusaka allegedly telling Inkyo that sleep apnea "could cause…excessive drowsiness…."   That *potential* complication, however, does not refute Inkyo's own acknowledgment that his sleep, breathing, and work were not affected by sleep apnea.

case.   *See* Dkt. No. 62 at 14-15 (citing *Feldman v. Olin Corp.*, 692 F.3d 748 (7th

Cir. 2012)).   The plaintiff in *Feldman*, however, submitted evidence of limitations

on his ability to sleep.   Specifically, a sleep study stating that the amount of time

the plaintiff spent sleeping was "very poor at 48%" and a doctor's note stating that

the plaintiff had "significant symptoms in terms of physical pain and excessive

sedation[.]"   *Feldman*, 692 F.3d at 754.   As discussed, Inkyo has done no such

thing here.[22]   *Feldman* is, therefore, not helpful to Inkyo's cause.   In this light,

Inkyo has failed to show that he was disabled for purposes of the ADA.[23]

While the analysis could end there, so the record is more fully complete, the

Court addresses one further glaring deficiency in Inkyo's effort to defeat summary

judgment in this case: pretext.[24]   As an initial matter, Inkyo does not dispute that

OTS has provided a legitimate, nondiscriminatory reason for his termination: the

"major preventable accident" triggering the automatic dismissal provision of the

---

[22]This includes the Home Sleep Apnea Study Report, which Inkyo does not contend provides a percentage of time he spends sleeping.   *See generally* Dkt. No. 61-5.

[23]Although it plays no role in the Court's analysis because it is not mentioned by OTS, in his own declaration, even Inkyo appears to acknowledge that he was not disabled at the time of his termination.   *See* Inkyo Decl. at ¶ 42 ("Once returned to work without restrictions, I was no longer disabled.").   Instead, without explanation, Inkyo declares that he "had a record of disability" when he was terminated, whatever that means.

[24]To do so, the Court assumes, without deciding, that, apart from disability, Inkyo has shown a dispute of fact over whether he is a "qualified individual" for purposes of the ADA and, even though he does not appear to specifically address the issue in his opposition, *see generally* Dkt. No. 62 at 13-19, whether his termination was "because of" his disability.

LCA.   DCSF at ¶ 61; *see generally* Dkt. No. 62.   Therefore, Inkyo must now

establish that OTS' reason was pretextual.   *See Snead v. Metro. Prop. & Cas. Ins.*

*Co.*, 237 F.3d 1080, 1093 (9th Cir. 2001) (explaining that, if a plaintiff establishes

a *prima facie* claim and an employer provides a non-discriminatory reason for its

conduct, a plaintiff must establish the reason was pretextual).   Inkyo can do so

"either directly by persuading the court that a discriminatory reason more likely

motivated the employer or indirectly by showing that the employer's proffered

explanation is unworthy of credence."   *Id*. at 1093-94.

Here, Inkyo has not come close to doing either.   Moreover, fairly construed,

his opposition does not even try.   Instead, in one short paragraph dedicated to the

issue of pretext, Inkyo asks only the following question: "If Plaintiff did not know

of his condition and the possibility of falling asleep as he did, how can the accident

be deemed 'preventable?'"   Dkt. No. 62 at 18-19.   Although Inkyo does not say

so, this question is perhaps meant to elicit a lack of credence in OTS' explanation

that Inkyo was terminated for causing a major *preventable* accident.[25]   Basically,

if Inkyo does not believe the accident was preventable, how could anyone?   This

question misses the point of the pretext inquiry.   The point is not whether the

---

[25]The Court notes that Inkyo is represented by counsel and, thus, the Court should not be
required, as it has been too frequently in this case, to speculate as to the nature of Inkyo's
arguments.

19

*plaintiff* alone believes that his termination was pretextual because, assuming a case is not frivolous, *every* plaintiff would believe as much. The point is whether *the employer's* reason was pretextual, and that, at least in this context, looks to whether "an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (quotations omitted).[26] Here, Inkyo does not dispute that each member of the MAC, after reviewing evidence of the July 2, 2020 accident, determined that it was preventable. Moreover, the evidence shows that at least two of the three MAC members had no knowledge Inkyo was even being treated for sleep apnea, let alone diagnosed with a disability. Finally, there is no evidence indicating that any one of the MAC members, including Tingcang, reached their decisions, or that OTS terminated Inkyo, because of sleep apnea. As a result, there is no evidence here that OTS did not "honestly believe[]" the July 2, 2020 accident was preventable and, thus, there is no evidence of pretext.[27]

---

[26]Therefore, contrary to Inkyo's belief, it is irrelevant whether he was, in fact, fatigued at the time of the July 2, 2020 accident. *See Villiarimo*, 281 F.3d at 1063 (explaining that it is "not important" whether a proffered explanation is "*objectively* false") (emphasis in original).

[27]While it plays no role in the findings herein, the Court notes that, if any explanation is unworthy of credence here, it is Inkyo's suggestion that, in the lead-up to the collision with the utility pole, he felt no fatigue and the collision was, instead, caused by him "suddenly" falling asleep. PCSF at ¶¶ 33, 59. Contrary to Inkyo's belief, there is no evidence in the record that *sleep apnea* causes a person to "fall asleep suddenly…." Dkt. No. 62 at 18. Instead, Inkyo's own declaration is clear that sleep apnea can cause *drowsiness*, *i.e.*, fatigue. Inkyo Decl. at ¶ 9 ("sleep apnea could cause … excessive drowsiness that was dangerous for driving the bus.").

For these reasons, Inkyo's claim of disability discrimination based upon his termination is meritless and OTS is, thus, entitled to summary judgment.

## CONCLUSION

For the reasons set forth herein, the motion for summary judgment, Dkt. No. 55, is GRANTED.   The Clerk is instructed to enter Judgment in favor of Defendant Oahu Transit Services, Inc., and then close this case.

IT IS SO ORDERED.

DATED: November 21, 2024 at Honolulu, Hawaiʻi.



Derrick K. Watson
Chief United States District Judge

---

Garrett S. Inkyo v. Oahu Transit Services, Inc.; Civil No. 22-00436 DKW-KJM;
**ORDER GRANTING DEFENDANT OAHU TRANSIT SERVICES, INC.'S MOTION FOR SUMMARY JUDGMENT**